## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SLATE HILL DAYCARE CENTER INC., on behalf of itself and all others similarly situated,<br><br>     Plaintiff,<br><br>  v.<br><br>REPUBLIC-FRANKLIN INSURANCE COMPANY,<br><br>     Defendant. | Case No.: 7:20-cv-03565 |

## <u>PLAINTIFF'S BRIEF IN RESPONSE TO DEFENDANT'S MOTION TO DISMISS</u>

### I. INTRODUCTION

Plaintiff Slate Hill Daycare Center Inc. ("Plaintiff") hereby responds to Defendant Republic-Franklin Insurance Company's ("Defendant") Motion to Dismiss. For the following reasons, Defendant's motion should be denied.

### II. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Plaintiff owns and operates two daycare centers in New York. In light of the ongoing COVID-19 pandemic and state and local orders mandating that all non-essential businesses must shut down, Plaintiff's and class members' businesses have suffered property damage, business income loss, extra expenses and other losses. Plaintiff and class members carry insurance policies issued by Defendant ("Policy"). *See* Second Amended Class Action Complaint ("CAC"), Ex. 1.[1] The Policy provides, in relevant part, coverage for business income loss and extra expense, including coverage for losses attributable to civil authority orders.

---

[1] The facts pleaded by Plaintiff are to be accepted as true in considering a Motion to Dismiss.

Business income loss coverage is triggered when Plaintiff's operations are suspended due to "direct physical loss of or damage to property at [the insured property] . . . caused by or result[ing] from a Covered Cause of Loss." Extra expense coverage is triggered when Plaintiff incurs expenses "that [Plaintiff] would not have incurred if there had been no direct physical loss or damage to property caused by or resulting from a Covered Cause of Loss." Civil authority coverage is triggered when "action of civil authority prohibits access to the described premises due to direct physical loss of or damage to property, other than at the [insured property]."

The Policy also contains a "virus exclusions" which purports to exclude coverage "for loss or damage caused by or resulting from any virus." *Id.*

On March 7, 2020, New York Governor Andrew Cuomo declared a Disaster Emergency for the entire state of New York as a result of COVID-19. On March 12, 2020, Governor Cuomo set restrictions on large gatherings. On March 20, 2020, the State of New York issued a stay-at-home order that all nonessential workers must stay at home as a result of the COVID-19 pandemic. On April 17, 2020, the State of New York ordered all individuals over the age of two to wear a face covering when in a public place. *See* CAC ¶¶ 53-56.[2]

The Civil Authority Orders entered by the state and local government were in the exercise of authority to protect the public, minimize the risk of spread of disease, protect property from damage and further damage, and because of contamination and damage to property caused by the coronavirus near Plaintiff's insured property. Even with the entry of these Orders, there remained physical impact not only in and within Plaintiff's insured property, but in and around the surrounding property due to the omnipresence of the coronavirus. While the coronavirus is generally not detectable other than through microscopic means and occurrence of illness, there is

---

[2] The modifications to the stay at home orders enabled Plaintiff to mitigate its damages but did not eliminate the underlying fact of losses and damages that Plaintiff suffered and continues to suffer.

no question that it is ubiquitous in the United States and one need only to simply follow the catastrophic number of cases and deaths associated with the coronavirus to understand its physical impact on society and business. These Civil Authority Orders were entered due to property damage caused by the coronavirus throughout the state. New York's civil authority order explicitly stated that the coronavirus and COVID-19 cause direct physical damage and loss to property.[3] Similarly, the Pennsylvania Supreme Court acknowledged that the Civil Authority Orders were enacted to protect the public from physical damage and loss caused by COVID-19. *See Friends of Danny DeVito v. Wolf*, 227 A.3d 872 (Pa. 2020). The Civil Authority Orders entered by New York and Pennsylvania state and local governments are similar to such orders entered by other authorities throughout the United States stating that they were entered because of direct physical damage and loss to property occurring. The coronavirus affects people and property in New York, Pennsylvania, and throughout the country in the same manner. Findings that the coronavirus causes physical damage and loss is the only reasonable understanding of the impact that the coronavirus has had in the United States.

Prior to entry of the Civil Authority Orders, Plaintiff's business was operating at full capacity. Now, Plaintiff is operating at severely reduced capacity because of the Orders put in place by state and local authority. The physical impact of the coronavirus and COVID-19 on Plaintiff's insured property and the surrounding property constitutes direct physical loss and is a covered cause of loss within the meaning of the Policy. Plaintiff, who had no part in the drafting of the Policy language, reasonably expected that they were paying premiums under the Policy for business income loss, extra expense, and civil authority coverage, and that they would not be caught in some semantical trap that enabled Defendant to deny coverage on some ambiguous

---

[3] Emergency Executive Order 101, City of New York, Office of the Mayor (Mar, 17, 2020), https://www1.nyc.gov/assets/home/downloads/pdf/executive-orders/2020/eeo-101.pdf.

technicality of the Policy that relies on facts that have not even been established to exist. Insurance contracts are contracts of adhesion and to be interpreted in favor of coverage and against a carrier. Plaintiff has submitted a claim to Defendant related to such losses, only to be denied.

Plaintiff subsequently filed a Complaint on May 7, 2020, which was amended on May 22 and June 29, 2020. Pursuant to the Court's order, Defendant served the present Motion to Dismiss on July 21, 2020.

## III.  ARGUMENT

### A.  Plaintiff's Claims Are Covered by the Policy

#### 1.  The Coronavirus and COVID-19 Cause Direct Physical Loss and/or Property Damage

Defendant's denial of coverage rests primarily on its interpretation of "physical loss" or "damage," arguing that the coronavirus has not and cannot cause physical damage. This assertion presents a question of fact, not a legal issue that can be decided at this early stage. Nevertheless, other courts and authorities have already affirmed that viruses and diseases like the coronavirus and COVID-19 can cause direct physical loss and property damage in the insurance context.[4]

*Studio 417, Inc. v. Cincinnati Ins. Co.*, No. 20-CV-03127-SRB, 2020 WL 4692385 (W.D. Mo. Aug. 12, 2020), also involved civil authority orders entered due to the COVID-19 pandemic causing property damage and business income loss, which triggered coverage on the plaintiff's insurance policy. *Id.* at *2. Studio 417, like the Plaintiff here, operates a public-facing business. The Western District of Missouri held in *Studio 417* that the plaintiff "adequately alleged a direct physical loss" because the coronavirus "is a physical substance" that can "attach[] to . . . property, making it 'unsafe and unusable, resulting in direct physical loss to the premises and property.'" *Id.*

---

[4] *See* Charles S. LiMandri et al., *Pandemic of Coverage Litigation for Business Income Losses Due to Coronavirus Plagues Insurance Industry*, 32 No. 4 Cal. Ins. L. & Reg. Rep NL 1 (2020) (gathering California cases in which direct physical loss was found without "structural damage or physical alteration to the covered property"); *TRAVCO Ins. Co. v. Ward*, 715 F. Supp. 2d 699, 708–09 (E.D. Va. 2010) (gathering case law from other jurisdictions).

at *4. The Court also stressed that "loss" and "damage," both of which are used in Plaintiff's Policy, should not be conflated, and "the Court must give meaning to both terms." *Id.* at *5. The Court went on to explain that the terms are "not synonymous" and that "even absent a physical alteration, a physical loss may occur when the property is uninhabitable or unusable for its intended purpose." *Id.* at *5 (citing *Auth. of New York and New Jersey v. Affiliated FM Ins. Co.*, 311 F.3d 226, 236 (3d Cir. 2002)).

Neither "direct physical loss" nor "damage" is defined in the Policy. It would be contrary to the plain, reasonable, and intended language of the Policy to narrowly interpret physical loss or damage as involving only physical alteration to the structure of the property. *See Hughes v. Potomac Ins. Co. of D.C.*, 199 Cal. App. 2d 239, 248–49, 18 Cal. Rptr. 650, 655 (Cal. Ct. App. 1962) ("Despite the fact that a 'dwelling building' might be rendered completely useless to its owners, appellant would deny that any loss or damage had occurred unless some tangible injury to the physical structure itself could be detected. Common sense requires that a policy should not be so interpreted in the absence of a provision specifically limiting coverage in this manner."); *Cragg v. Allstate Indem. Corp.,* 926 N.Y.S.2d 867, 950 N.E.2d 500, 502 (N.Y. 2011) ("Insurance contracts must be interpreted according to common speech and consistent with the reasonable expectations of the average insured"); *Oppenheimer AMT-Free Municipals v. ACA Financial Guar. Corp.*, 971 N.Y.S.2d 95, 98 (N.Y. App.Div. 2013) (same).

The origin of language in many insurance policies is from an entity known as the Insurance Services Office ("ISO"). Plaintiff understands that this organization is responsible for drafting the standardized language in Plaintiff's Policy. But more importantly, the ISO has affirmed that a virus can cause physical loss and damage merely by its presence. The ISO's 2006 circular for an Exclusion Regarding Loss Due to Virus or Bacteria reads, in part:

Disease-causing agents may render a product impure (change its quality or substance), or enable the spread of disease by their presence on interior building surfaces or the surfaces of personal property. When disease-causing viral or bacterial contamination occurs, potential claims involve the cost of replacement of property (for example, the milk), cost of decontamination (for example, interior building surfaces), and business interruption (time element) losses.

Although building and personal property could arguably become contaminated (often temporarily) by such viruses and bacteria, the nature of the property itself would have a bearing on whether there is actual property damage. An allegation of property damage may be a point of disagreement in a particular case.[5]

But Defendant, again raising a factual issue, stresses that the physical loss and damage underlying Plaintiff's claims are "intangible" or "incorporeal." *See* Def. Br., at 11. Defendant fails to recognize the important difference between Plaintiff's losses and those of the parties in Defendant's cited cases.

Defendant cites to *Newman Myers Kreines Gross Harris, P.C. v. Great N. Ins. Co.*, 17 F. Supp. 3d 323 (S.D.N.Y. 2014), in which a business was unable to operate due to a government-initiated power outage in preparation for Hurricane Sandy. The court denied business income loss coverage because the inability of the business to operate was not caused by physical loss or damage, as required by the policy. *Roundabout Theatre Co. v. Cont'l Cas. Co.*, 302 A.D.2d 1 (N.Y. Sup. Ct. 2002), involved a nearby construction accident, but the court denied coverage because the plaintiff's policy only covered damage to the insured property. In *MRI Healthcare Ctr. of Glendale, Inc. v. State Farm Gen. Ins. Co.*, 187 Cal. App. 4th 766, 778–80 (Cal. Ct. App. 2010), the plaintiff filed a claim related to an MRI machine which suddenly stopped working. The court denied coverage because "[t]he failure of the MRI machine to satisfactorily 'ramp up' emanated

---

[5] ISO Circular LI-CF-2006-175, New Endorsements Filed to Address Exclusion of Loss Due to Virus or Bacteria, ISO (July 6, 2006), https://www.propertyinsurancecoveragelaw.com/files/2020/03/ISO-Circular-LI-CF-2006-175-Virus.pdf.

from the inherent nature of the machine itself rather than actual physical 'damage.'" *Id.* at 780. In *Port Auth. of New York & New Jersey*, 311 F.3d 226, the court denied coverage related to the discovery of asbestos in a building because the asbestos was only in structural components of the building that did not pose a risk—though the court acknowledged that its mere presence in inhabited areas would be considered "physical loss." *Id.* at 236. And finally, in *Mama Jo's, Inc. v. Sparta Ins. Co.*, No. 17-CV-23362-KMM, 2018 WL 3412974 (S.D. Fla. June 11, 2018), the court denied property damage coverage for "cleaning, painting and striping the parking lot" of the plaintiff's business, which the plaintiff felt was necessary due to "the migration of dust and construction debris from the roadwork adjacent to the restaurant." These cases are clearly distinguishable from the present case in which coverage is sought for physical loss or damage caused by the actual presence of the coronavirus, creating a serious risk to the safety of others, and civil authority orders. *See Studio 417*, 2020 WL 4692385, at *5 ("[E]ven absent a physical alteration, a physical loss may occur when the property is uninhabitable or unusable for its intended purpose.") (citing *Port Auth. of New York and New Jersey*, 311 F.3d 226, 236); *see, e.g.*, *Schlamm Stone & Dolan, LLP v. Seneca Ins. Co.*, 800 N.Y.S.2d 356 (N.Y. Sup. Ct. 2005) (holding that "dust and noxious particles in the air" may constitute physical loss or damage and "the presence [of] noxious particles [on plaintiff's property] thereon clearly impairs plaintiff's ability to make use of [it]").

Importantly, all of these cases were decided at the summary judgment stage, which affirms Plaintiff's argument that a determination of the factual issue of physical loss is properly left until after discovery. *See Studio 417*, 2020 WL 4692385, at *5 ("Plaintiffs correctly respond that these cases were decided at the summary judgment stage, are factually dissimilar, and/or are not binding.").

Defendant also raises two recent cases related to COVID-19: *Gavrilides Mgmt. Co. v. Michigan Ins. Co.*, No. 20-258-CB (Mich. Cir. Ct., Ingham), and *Social Life Magazine Inc. v. Sentinel Ins. Co. Ltd.*, No. 20-cv-3311 (S.D.N.Y.), which both involve policies, facts, and oral decisions that are distinguishable. In *Gavrilides*, the Michigan trial court held that no coverage existed when the plaintiff conceded it had no property damage, and that decision is currently being appealed. And in *Social Life Magazine*, in which the court was considering only a preliminary injunction, the court permitted Plaintiff to amend its complaint to add allegations as to property damage. In both cases, the courts cited state laws interpreting "physical damage" as requiring an alteration to the integrity of the property and ignoring the phrase "loss." Thus, this Court should not consider these rulings dispositive at this stage. *See also Studio 417*, 2020 WL 469238, at *6 n.5 (rejecting defendant's argument that *Gavrilides* and *Social Life* are determinative).

Contamination in Plaintiff's property or the surrounding area poses a serious threat to anyone who comes close to those properties. In *Hughes*, the court considered "a building which has been overturned or which has been placed in such a position as to overhang a steep cliff." Even if the property is physically unharmed, it is "completely useless" to its owners due to the immediate peril that it places upon anyone who goes near the property. The court held that this would constitute direct physical loss or damage. *Hughes*, 199 Cal. App. 2d at 248-49. Similarly, a person who enters an area where there is coronavirus contamination might not notice any physical damage, but there is an immediate threat of injury that did not exist before. *See also Studio 417*, 2020 WL 4692385, at *4 (holding that the coronavirus "is a physical substance" that can "attach[] to . . . property, making it 'unsafe and unusable, resulting in direct physical loss to the premises and property'"); *cf. Friends of Danny DeVito*, 227 A.3d at 889 ("More fundamentally, Petitioners' argument ignores the nature of this virus and the manner in which it is transmitted. The virus

spreads primarily through person-to-person contact, has an incubation period of up to fourteen days, one in four carriers of the virus are asymptomatic, and the virus can live on surfaces for up to four days. Thus, any location (including Petitioners' businesses) where two or more people can congregate is within the disaster area."). The presence of the coronavirus in Plaintiff's property and surrounding properties therefore constitutes direct physical loss or damage.

Defendant is simply wrong that the physical loss or damage required under the Policy must physically *alter* the property. Recently, coverage was extended to alleged damage to an insured's home where defective Chinese-manufactured drywall released sulfur gases throughout the home, requiring the insured homeowner to remove and replace the drywall and preventing the homeowner from fully using and enjoying the home. *In re Chinese Manufactured Drywall Prod. Liab. Litig.*, 759 F. Supp. 2d 822 (E.D. La. 2010). Other Courts have held that when a property is not habitable, that in and of itself constitutes physical loss or damage, triggering coverage. *W. Fire Ins. Co. v. First Presbyterian Church*, 437 P.2d 52 (Colo. 1968) (holding that such circumstances, combined with a government declaration of uninhabitability, amounted to a direct physical loss). In other words, when an outside force—*i.e.*, virus—affects Plaintiff's property and requires it to shut down, there is direct physical loss or damage to the property.

There is a discrepancy in cases that require a physical, tangible alteration to the property as opposed to uninhabitability of the property. In explaining why some cases do not provide property damage for damage that is not tangible, Couch on Insurance reasons:

> One good argument for this seeming discrepancy is that the asbestos was presumably put there deliberately, as part of the normal building and construction process, and, as such, is considerably less fortuitous than fumes from gasoline that has strayed onto the insured premises from property owned and controlled by another. The fortuity concept is, of course, a foundational concept in insurance law, and the fortuitous leaking of gasoline is much closer to the

> classic "random risk" that insurers are in the business of assessing
> than is the concealed but intentional presence of asbestos.

Couch on Insurance § 148:46 (3d ed. 2019). Essentially, when a "fortuitous" event causes property to be unsafe to use, then it constitutes a direct physical loss.

In this case, Plaintiff's property and surrounding property was contaminated by the coronavirus, which forced Plaintiff to shut down its business, causing business income loss. This constitutes direct physical loss or damage, triggering coverage.

### 2. Property Damage, Business Income Loss, and Extra Expense Coverage Apply

Plaintiff alleges that its insured property is at imminent risk of coronavirus contamination, that it has already been contaminated, and that surrounding property has been contaminated. *See* CAC ¶¶ 78-85. As explained above, the presence of the coronavirus throughout the State of New York is pervasive, warranting statewide shutdowns and mask mandates. California has had over 426,000 positive cases of COVID-19 and over 25,200 deaths as of the date of this brief, increasing every day.[6] Plaintiff's business is in the New York City metropolitan area, one of the hardest hit areas of the country. *Cf. Friends of Danny DeVito*, 227 A.3d at 889-90 (affirming the Pennsylvania governor's authority to declare the entire state a "disaster area" because "COVID-19 cases have now been reported in all counties in the Commonwealth").

Plaintiff's business has been affected by both statewide and local orders prohibiting access to its insured property due to the clear evidence of the coronavirus being present throughout the state, and the severe safety risks associated with allowing individuals to come in close contact. The staggering number of cases and deaths, along with the institution of strict orders affecting Plaintiff's business, are strong evidence of the presence of the coronavirus in or near Plaintiff's

---

[6] *See* New York, The COVID Tracking Project, https://covidtracking.com/data/state/new-york (last visited August 19, 2020).

insured property, constituting direct physical loss or damage. *See Studio 417*, 2020 WL 4692385, at *6 n.6 ("Defendant also argues that Plaintiffs have failed to adequately allege that COVID-19 was actually present on their premises. Based on Plaintiff's allegations, and because of COVID-19's wide-spread, this argument is also rejected.").

Because Plaintiff alleges direct physical loss or damage caused by the coronavirus at Plaintiff's insured property, and that both the coronavirus pandemic and the civil authority orders caused Plaintiff's business to shut down, lose income, and incur extra expenses, Plaintiff is entitled to coverage for property damage, loss of business income, and extra expenses.

### 3. Civil Authority Coverage Applies

Plaintiff is also entitled to civil authority coverage because Plaintiff has alleged in that (1) the coronavirus and COVID-19 have caused direct physical loss or damage to surrounding property near the insured property, (2) civil authority Orders have prohibited customers from accessing the insured property, (3) access to the area immediately surrounding the insured property is likewise prohibited, (4) and the civil authority Orders were put in place to respond to the coronavirus and COVID-19 contaminating the surrounding area. *See Studio 417*, 2020 WL 4692385, at *7 ("Plaintiff adequately allege that they suffered a physical loss, and such loss is applicable to other property.").

Defendant argues that civil authority coverage does not apply to Plaintiff's claims because the civil authority orders did not specifically prohibit access to Plaintiff's business. But Defendant's cited cases are inapposite. *United Air Lines, Inc. v. Ins. Co. of State of PA*, 439 F.3d 128 (2d Cir. 2006), held that civil authority coverage could not apply because the prohibition of access to Ronald Reagan National Airport was not caused by the September 11 attack on the Pentagon, but rather as a national security precaution. *Id.* at 134. *Dickie Brennan & Co. v. Lexington Ins. Co.*, 636 F.3d 683 (5th Cir. 2011), concerned a claim for business interruption losses

arising out of an evacuation order for New Orleans due to the threat of Hurricane Gustav, but there was no requisite property damage prompting the order near the plaintiff's business. *Id.* at 685; *but see Narricot Indus., Inc. v. Fireman's Fund Ins. Co.*, No. CIV.A.01-4679, 2002 WL 31247972, at *4 (E.D. Pa. Sept. 30, 2002) (finding civil authority coverage—involving a substantially similar provision to Plaintiff's Policy—following orders to close businesses due to a hurricane). In *54th St. Ltd. Partners, L.P. v. Fid. & Guar. Ins. Co.*, 306 A.D.2d 67 (N.Y. Sup. Ct. 2003), the court denied civil authority coverage where traffic was being diverted near the plaintiff's restaurant, but there was no prohibition of access and the restaurant was still accessible.

These cases are unlike the present case in which Plaintiff was specifically required to suspend operations due to ongoing physical loss and damage from the coronavirus in the area of Plaintiff's business, not merely as a precaution against potential future loss. Further, Plaintiff's business income loss was not caused by a mere slowdown in business or an inconvenience to customers, but an actual prohibition of access to Plaintiff's insured property. And again, Defendant's cited cases were decided at the summary judgment stage and should therefore not be determinative. *See Studio 417*, 2020 WL 4692385, at *5 ("Plaintiffs correctly respond that these cases were decided at the summary judgment stage, are factually dissimilar, and/or are not binding.").

Additionally, civil authority coverage is triggered because Plaintiff's employees and customers were prohibited from accessing the insured property by the civil authority Orders. Defendant, however, unsupported by the Policy language or any case law, argues that the Policy requires *absolute* prohibition of *any* access in order to trigger this provision. The court in *Studio 417* considered and rejected the same argument because the plain language of the Policy does not require this. In *Studio 417*, the Defendant argued that the civil authority orders permitted restaurant

plaintiffs to stay open to offer takeout service, along with other similar limitations, and therefore there was not a true prohibition of access. But there is no requirement in the Policy that access is *absolutely* prohibited. *See Studio 417*, 2020 WL 4692385, at *7 ("[T]he Policies require that the 'civil authority prohibits access,' but does not specify 'all access' or 'any access' to the premises."). "At the motion to dismiss stage, these allegations plausibly allege that access was prohibited to such a degree as to trigger the civil authority coverage." *Id.* at 14. Defendant's semantic argument should therefore be dismissed.

Further, civil authority coverage does not require Plaintiff's business to completely suspend all operations. In fact, language throughout the Policy contemplates a partial "suspension" of business, still triggering coverage. For example, "Extra Expense" coverage may be triggered when an expense is incurred "[t]o avoid or *minimize* the suspension of business and to *continue* 'operations.'" *See* Policy, Form PB 00 02 11 14, at 39. And for purposes of another exclusion, "suspension" includes a "partial slowdown or complete cessation of your business activities." *See* Policy, Form PB 00 02 11 14, at 26. Because the Policy makes clear that the terms "suspension" may be susceptible to definitions other than the one proffered by Defendant, Defendant's interpretation should not be favored.

Accordingly, Plaintiff is entitled to coverage for loss of business income and extra expenses as a result of the civil authority Orders.

### B.  Plaintiff's Claims Are Not Excluded by the Policy

#### 1.  The Virus Exclusion Does Not Apply to Civil Authority Coverage

Defendant's argument that the virus exclusion precludes civil authority coverage misconstrues the plain language of the Policy. While Plaintiff does not believe the virus exclusion excludes coverage for property damage, as discussed more fully below, the virus exclusion does not apply to business income loss caused by the civil authority orders. The exclusion purports to

exclude coverage "for loss or damage caused directly or indirectly by . . . [a]ny virus." However, Plaintiff's business income loss was also caused by the civil authority Orders, *not solely* by the coronavirus. There is no exclusion in the policy for civil authority orders that were entered due to a pandemic.

Further, the language of the exclusion shows that it does not apply to civil authority coverage, because the payout for civil authority coverage comes from business income loss or extra expense caused by the civil authority orders, not solely the property damage caused by the virus. When civil authority coverage is invoked, Defendant would pay for Plaintiff's business income loss or extra expense caused by the civil authority Orders, *not* the actual damage to surrounding property caused by the virus which prompted the civil authority Orders. The exclusion therefore cannot be invoked by civil authority coverage.

The exclusion plainly contemplates the actual damage caused by a virus, not every event in a causal chain leading back to a virus. Defendant has not cited any case law holding that the tenuous connection between an excluded cause of loss prompting a civil authority order, the institution of a civil authority order, and business income loss or extra expense resulting from the civil authority order can preclude coverage. To permit Defendant's unlimited view of causation would produce absurd results. *Parks Real Estate Purchasing Grp. v. St. Paul Fire & Marine Ins. Co.*, 472 F.3d 33, 45 (2d Cir. 2006) ("Without some limiting principle, the pollution exclusion clause would extend far beyond its intended scope, and lead to some absurd results.") (quoting *Pipefitters Welfare Educ. Fund v. Westchester Fire Ins. Co.*, 976 F.2d 1037, 1043 (7th Cir. 1992)). Simply, Plaintiff's business income loss and extra expense resulting from the civil authority Orders are not affected by the virus exclusion.

### 2. Denying Coverage Under the Virus Exclusion Would Be Contrary to the Reasonable Expectations of the Parties

"[P]olicy exclusions are construed narrowly and against insurers, because they draft the policies." *Pan Am. World Airways, Inc. v. Aetna Cas. & Sur. Co.*, 505 F.2d 989, 999 (2d Cir. 1974). An insurance contract, like that obtained by the Plaintiff here, is an inherently adhesive instrument. Plaintiff had no part in the drafting of any Policy language, so Plaintiff's reasonable interpretation of the Policy should be favored. "Insurance contracts are usually contracts of adhesion in that their terms are generally dictated rather than negotiated. Courts therefore require insurance companies to be clear and unambiguous in creating limitations on coverage. '[T]he insurer has the burden of establishing that the words and expressions used not only are susceptible of [the] construction [that the insurer advocates], but that it is the only construction that can fairly be placed thereon.'" *Am. Home Prod. Corp. v. Liberty Mut. Ins. Co.*, 565 F. Supp. 1485, 1492 (S.D.N.Y. 1983), *aff'd as modified,* 748 F.2d 760 (2d Cir. 1984) (quoting *Bronx Sav. Bank v. Weigandt*, 1 N.Y.2d 545, 551, 136 N.E.2d 848, 851 (N.Y. 1956)) (internal quotation omitted).

Defendants' offering of the Policy instilled a reasonable expectation in Plaintiff that it was paying Policy premiums for business income and extra expense coverage and that if its business was forced to shut down, that the Policy would provide coverage. Defendants' denial of coverage is contrary to the reasonable expectations of the parties, and Defendants' attempt to exclude coverage under these circumstances should be disfavored. *See Cragg*, 950 N.E.2d at 502 ("Insurance contracts must be interpreted according to common speech and consistent with the reasonable expectations of the average insured"); *Oppenheimer*, 971 N.Y.S.2d at 98 (same). Accordingly, this Court must resolve any contractual ambiguities in favor of the insured. Courts must strictly construe an exclusion against the insurer who is trying to rely upon it.

The plain language of the Policy exclusion clearly contemplates scenarios involving temporary contamination of a property, such as with E. coli, salmonella, or "listeria bacteria in milk,"[7] which are relatively common. It does not contemplate a worldwide pandemic of a novel coronavirus that results in statewide shutdown orders. *Cf. MacKinnon v. Truck Ins. Exch.*, 73 P.3d 1205, 1214 (Cal. 2003) (considering the absurd implications of permitting anything which could possibly be considered an "irritant or contaminant" to preclude coverage pursuant to a pollution exclusion).

In fact, the ISO, when seeking approval for the "Exclusion of Loss Due to Virus or Bacteria," acknowledged that it was intended for losses and damage associated with "disease" and actual "contamination" of the insured property.[8] Other insurers have been much more specific in drafting and specifically using the "pandemic" language. *See, e.g.*, *Meyer Nat. Foods, LLC v. Liberty Mut. Fire Ins. Co.*, 218 F. Supp. 3d 1034, 1038 (D. Neb. 2016) ("The actual or suspected presence or threat of any virus, organism or like substance that is capable of inducing disease, illness, physical distress or death, whether infectious or otherwise, including but not limited to any epidemic, pandemic, influenza, plague, SARS, or Avian Flu."). A reasonable reading of the virus exclusion language by a layman would not suggest that a pandemic, or civil authority Orders issued to combat a pandemic, are excluded. The Court should not reward the Defendant for failing to properly draft its exclusion nor permit it to expand the scope of its virus exclusion that does not address a pandemic.

Accordingly, the virus exclusion is not applicable to Plaintiff's claims.

---

[7] *See* ISO Circular LI-CF-2006-175, New Endorsements Filed to Address Exclusion of Loss Due to Virus or Bacteria, ISO (July 6, 2006), https://www.propertyinsurancecoveragelaw.com/files/2020/03/ISO-Circular-LI-CF-2006-175-Virus.pdf.

[8] *See id.* ("In light of these concerns, we are presenting an exclusion relating to contamination by disease-causing viruses or bacteria or other disease-causing microorganisms.").

### 3. Plaintiff's Regulatory Estoppel Argument Requires Further Discovery

When submitting the boilerplate virus exclusion language for approval to state insurance departments, the ISO argued that the virus exclusion would merely *clarify* that damage caused by a virus was not covered by property policies. However, prior case law finding coverage for damage caused by viruses contradicts the ISO's statements. It is therefore not entirely understood why the ISO made those statements or what the scope of the exclusion was understood to be by insurance regulators. "[A]n industry that makes representations to a regulatory agency to win agency approval will not be heard to assert the opposite position when claims are made by litigants such as insured policyholders." *Hussey Copper, Ltd. v. Arrowood Indem. Co.*, 391 F. App'x 207, 211 (3d Cir. 2010) (citation, quotations, and emphasis omitted).

Discovery is necessary to explore the ISO's representations as to the scope of the virus exclusion. *See Hussey Copper, Ltd. v. Royal Ins. Co. of Am.*, 567 F. Supp. 2d 774, 787 (W.D. Pa. 2008) (permitting discovery regarding plaintiff's regulatory estoppel theory, focusing on what was said to state regulators in getting an insurance exclusion approved, before ruling on a motion for summary judgment); *Sunbeam Corp. v. Liberty Mut. Ins. Co.*, 781 A.2d 1189 (Pa. 2001) (remanding to trial court to apply the doctrine of regulatory estoppel); *Morton Int'l, Inc. v. Gen. Acc. Ins. Co. of Am.*, 629 A.2d 831, 848 (N.J. 1993) (finding that statements made to regulators were relevant as to whether an exclusion applies to a policy).

To the extent a virus exclusion is added to a Policy, many fact issues exist as to whether and how well the purpose and intent of the exclusion was communicated to insurance regulators for the state. The premiums that insurance carriers charge for coverage are typically approved by state regulators. State regulators make their determination based on their understanding of the level of risk being insured. When an insurance carrier reduces the level of risk it insures, that typically

results in a reduction in premiums. Thus, changes in policy terms must adequately communicate to insurance regulators the impact that the change in terms may have on the risk insured. If new policy language reduces or eliminates coverage, then the state regulators may require a reduction in the premium because the risk being insured has changed. But if an insurance carrier changes policy language to reduce coverage while presenting the new language to an insurance regulator as merely clarifying coverage without disclosing that the new language actually reduces coverage, this would be tantamount to the insurance carrier misleading state regulators to approve a language change as though the change has no impact on coverage. There is no record on this, yet Plaintiff asserts regulatory estoppel because of the information and belief that the virus exclusion may have been permitted to be included in its Policy without adequate and proper disclosure of the impact of same to insurance regulators. Thus, the parties here require discovery to examine the scope and validity of the virus exclusion.

### 4. The Parties Require Discovery to Ascertain the Scope and Validity of the Virus Exclusion

The virus exclusion is ambiguous, raising questions as to its intended meaning, or even whether its approval was obtained using false or misleading statements. Defendant is now arguing that the virus exclusion unequivocally excludes coverage for loss or damage even remotely related to a virus, when this was not the intended or understood scope.

This Court should consider extrinsic evidence related to the scope and validity of the virus exclusion in order to make a fair and accurate determination on these issues. *Catlin Speciality Ins. Co. v. QA3 Fin. Corp.*, 36 F. Supp. 3d 336, 341 (S.D.N.Y. 2014), *aff'd*, *Catlin Specialty Ins. Co. v. QA3 Fin. Corp.*, 629 F. App'x 127 (2d Cir. 2015) ("If [] the language in the insurance contract is ambiguous and susceptible of two reasonable interpretations, the parties may submit extrinsic evidence as an aid in construction, and the resolution of the ambiguity is for the trier of fact.")

(quoting *State v. Home Indem. Co.*, 66 N.Y.2d 669, 671, 486 N.E.2d 827, 829 (N.Y. 1985)). When determining whether a virus exclusion clause can properly exclude coverage for business income loss and extra expense that was the result of a civil authority order issues in response to the COVID-19 pandemic, the Court should consider statements made to regulators to determine whether the exclusion clause was properly intended to exclude losses such as Plaintiff's or losses related to a pandemic. The Court should also consider statements made to regulators to determine whether the insurers intended to exclude such coverage. Because the Policy uses the standardized form language that was created by the ISO, it is premature to consider whether the exclusion applies in this case. Further, Defendant should not be able to claim that the ISO's improper application for the virus exclusion does not estop Defendant from using it; Defendant, as the intended beneficiary of the ISO's application, should also be estopped from improperly taking advantage of the virus exclusion. Discovery must be considered to determine what was represented to insurance regulators as to the scope and meaning of the exclusion. *See Sunbeam Corp.*, 781 A.2d at 1195 (considering statements made to the Pennsylvania insurance department to determine the scope of a pollution exclusion); *Morton Int'l, Inc. v. Gen. Acc. Ins. Co. of Am.*, 629 A.2d 831, 848 (N.J. 1993) (finding that statements made to regulators were relevant as to whether an exclusion applies to a policy).

### C. Issues Raised in Defendant's Motion Are Not Ripe

Ultimately, the issues raised in Defendant's Motion to Dismiss are not ripe at this stage of the litigation. Material and complex factual issues—including whether there exists physical loss or damage, the mechanism by which the coronavirus and COVID-19 cause property damage and illness, the infectiousness and health risks of COVID-19, and the expense that is necessary for remediation—have not yet been fully investigated. Without discovery into these issues, there can be no clear justification behind Defendant's denial of coverage to Plaintiff. This Court should deny

Defendant's Motion to Dismiss pending discovery, including expert discovery, on these and other relevant issues.

Plaintiff intends to support its allegations through evidence that its insured property and the surrounding area has experienced physical loss and property damage as a result of the coronavirus and COVID-19. Because of the nature of the coronavirus and COVID-19, expert testimony is necessary to demonstrate the property damage. This case is unlike other property damage cases where the damage is apparent to a lay witness. In fact, the damage is not visible to ordinary lay witnesses, which is what prompted the shutdown of all businesses.

Expert testimony will demonstrate that Plaintiff's insured property and the surrounding area are, as alleged, damaged, how the damage occurred, and that the property will remain damaged until remediated. To demonstrate Plaintiff's property damage, Plaintiff intends to serve discovery on Defendant.

## IV. CONCLUSION

For the foregoing reasons, Defendant's Motion to Dismiss should be denied.

Dated: September 1, 2020                    Respectfully submitted,

*/s/ Michael W. Weinkowitz*
Arnold Levin, Esq.
Laurence Berman, Esq.
Frederick Longer, Esq.
Michael W. Weinkowitz, Esq.
Daniel Levin, Esq.
**LEVIN SEDRAN & BERMAN LLP**
510 Walnut Street, Suite 500
Philadelphia, PA 19106-3697
Telephone: (215) 592-1500
alevin@lfsblaw.com
flonger@lfsblaw.com
mweinkowitz@lfsblaw.com
dlevin@lfsblaw.com

Richard M. Golomb, Esq.
Kenneth J. Grunfeld, Esq.
**GOLOMB & HONIK, P.C.**
1835 Market Street, Suite 2900
Philadelphia, PA 19103
Telephone: (215) 985-9177
Facsimile: (215) 985-4169
rgolomb@golombhonik.com
kgrunfeld@golombhonik.com

Aaron Rihn, Esq.
**ROBERT PEIRCE & ASSOCIATES**
707 Grant Street, Suite 125
Pittsburgh, PA 15219
Telephone: (412) 281-7229
Facsimile: (412) 281-4229

W. Daniel "Dee" Miles, III
Rachel N. Boyd
Paul W. Evans
**BEASLEY, ALLEN, CROW, METHVIN,
PORTIS & MILES, P.C.**
P.O. Box 4160
Montgomery, AL 36103
Telephone: (334) 269-2343
Facsimile: (334) 954-7555

*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

This is to certify that on September 1, 2020 a copy of the foregoing was served on all counsel via the Court's electronic notification system.

/s/ Michael W. Weinkowitz
Michael W. Weinkowitz, Esq.